FILED

**UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF FLORIDA** 2012 JUN 27   AM 11: 54

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

R. VICTOR TAGLIA; JOHN G. GRUBBS; ANJA M. VERHEES; JOSEPH
CAPPUCCINO; SHELLEY R. JENSEN,

          Plaintiffs,

                             Case No. 3:12 -CV- 731 -J-99mmH -JBT

vs.

DEFENDANTS ERG ENTERPRISES, LP; LUBERT-ADLER MANAGEMENT
COMPANY, LP; LUBERT-ADLER REAL ESTATE FUND III, LP; LUBERT-ADLER
REAL ESTATE PARALLEL FUND III, LP; LUBERT-ADLER CAPITAL REAL
ESTATE FUND III, LP; LUBERT-ADLER REAL ESTATE FUND IV, LP;
LUBERT-ADLER REAL ESTATE PARALLEL FUND IV, LP; LUBERT-ADLER
CAPITAL REAL ESTATE FUND IV, LP; LUBERT-ADLER REAL ESTATE
FUND V, LP; LUBERT-ADLER REAL ESTATE PARALLEL FUND V, LP; DEAN S.
ADLER; GINN WEST END GP, LLC; GINN-LA WEST END LTD, LLLP; GINN-LA
CS BORROWER, LLC; GINN-LA CONDUIT LENDER, INC.; GINN-LA CS
HOLDING COMPANY; GINN-LA OBB, LIMITED- CORP; GINN FINANCIAL
SERVICES; BAHAMAS SALES ASSOCIATE, LLC; GINN TITLE SERVICES, LLP;
EDWARD R. GINN, III; JOHN DOES 1-15,

          Defendants.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

PLAINTIFFS, for their Complaint herein, allege as follows:

### JURISDICTION

1.    This Court has jurisdiction in this action pursuant to 28 U.S.C. § 1331 and 18

U.S.C. § 1964(a) and (c).

2.    This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over

the state common-law claims alleged herein.

3.    This Court has personal jurisdiction over the Defendants and each of them

pursuant to 18 U.S.C. §§ 1965(a) and (d).  This Court has personal jurisdiction over the

Defendants and each of them because at all times relevant to this Complaint, Defendants, either individually or through their agents, officers or representatives, engaged in and carried on business activities in the State of Florida relating to the allegations herein; maintained business offices in the State of Florida; committed statutory violations within the State of Florida, as alleged herein; and caused injuries to Plaintiffs that arose out of acts or omissions that occurred within the State of Florida, as alleged herein.

## VENUE

4.   Venue for this action is appropriate in this Court under 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district and division, and because several of the Defendants reside and/or transact business in this district and division.

## THE PARTIES

5.   Plaintiffs R. Victor Taglia and John G. Grubbs ("Taglia Group") are and, at all times relevant to the allegations herein, were residents of the State of Florida who purchased two undeveloped parcels of real property, Lot 220 and Lot 429, in the Ginn Sur Mer subdivision on Grand Bahama Island ("GSM" or the "GSM Subdivision").

6.   Plaintiff Anja M. Verhees ("Verhees") is and, at all times relevant to the allegations herein, was a resident of the State of Florida who purchased an undeveloped parcel of real property, Lot 79, in GSM.

7.   Plaintiffs Joseph Cappucinno and Shelley R. Jensen ("Capuccino Group") are and, at all times relevant to the allegations herein, were residents of the State of California who purchased two undeveloped parcel of real property, Lot 281 and Lot 282, in GSM.

8.   Defendant Lubert-Adler Management Company, LP d/b/a Lubert-Adler Partners, LP ("Lubert-Adler") is a Delaware limited partnership with its principal place of business in Philadelphia, PA.  Defendant Lubert-Adler is a private-equity fund management company that invests and participates in real estate development projects.  As of mid-2006, Defendant Lubert-Adler had invested over $800 million in Ginn development projects.

9.   Defendant Lubert-Adler is the ultimate parent company of Defendants Lubert-Adler Real Estate Fund III, LP; Lubert-Adler Real Estate Parallel Fund III, LP and Lubert-Adler Capital Real Estate Fund III, LP (collectively "Lubert-Adler Fund III"); Lubert-Adler Real Estate Fund IV, LP; Lubert-Adler Real Estate Parallel Fund IV, LP and Lubert-Adler Capital Real Estate Fund IV, LP (collectively "Lubert-Adler Fund IV"); Lubert-Adler Real Estate Fund V, LP and Lubert-Adler Real Estate Parallel Fund V, LP (collectively "Lubert-Adler Fund V").  Defendants Lubert-Adler Funds III, IV and V each held an 80% equity interest in the Ginn entities in which those Funds were invested, including but not limited to Defendants Ginn-LA CS Borrower, LLC; Ginn-LA CS Holding, Ginn-LA West End LLLP and Ginn-LA Conduit Lender (collectively Ginn-LA Entities").

10.  Defendant Dean S. Adler is an individual who co-founded and co-owns (with Ira M. Lubert) Defendant Lubert-Adler and Lubert-Adler Funds III, IV and V.

11.  Defendants Lubert-Adler and Dean Adler had control of the Ginn-LA Entities. At all material times hereto, Defendants Lubert-Adler and Dean Adler knew of, managed, controlled, ratified and/or participated in the actions of the Defendant Ginn-LA Entities named herein.  Defendants Lubert-Adler and Dean Adler had actual knowledge or

3

knowledge fairly implied on the basis of objective circumstances, of the acts of the Defendant Ginn-LA Entities named herein, as well as of the acts of Bobby Ginn.

12. Defendant Ginn West End GP, LLC ("Ginn West End") is a Georgia limited liability company formed on October 28, 2004, with its principal place of business located in Palm Coast, Florida.

13. Defendant Ginn-LA West End Ltd, LLLP ("GLA West End LLLP") is a Georgia limited liability limited partnership formed on November 2, 2004, with its principal place of business located in Palm Coast, Florida.

14. Defendant Ginn-LA CS Borrower, LLC ("CS Borrower") is a Delaware limited liability company formed on April 18, 2006, with its principal place of business located in Palm Coast, Florida.

15. Defendant Ginn-LA Conduit Lender, Inc. ("Conduit Lender") is a Delaware corporation formed on May 5, 2006, with its principal place of business located in Celebration, Florida.

16. Defendant Ginn-LA OBB, Limited-Corp. ("GLA OBB") is a Bahamian corporation formed on December 21, 2006, with its principal place of business located in Palm Coast, Florida.

17. Defendant ERG Enterprises, LP ("ERG ") is a Georgia limited partnership formed on December 29, 2005, with its principal place of business located in Palm Coast, Florida.

18. Defendant Ginn Financial Services, LLC ("Ginn Financial") is a Georgia Limited Liability Company formed on June 10, 2005, with its principal place of business located in Palm Coast, Florida.

19.   Defendant Bahamas Sales Associate, LLC ("Bahamas Sales") is a Delaware corporation formed on August 4, 2006 with its principal place of business located in Palm Coast, Florida.  Bahamas Sales was formed

20.   Defendant Ginn Title Services, LLC ("Ginn Title") is a Georgia Limited Liability Company formed on September 13, 2005 with its principal place of business located in Palm Coast, Florida.

21.   Defendant Edward R. Ginn, III ("Bobby Ginn") resides at 42 Island Estates Parkway, Palm Coast, Florida 32137.

22.   Each Defendant is sued individually as a primary violator and as an aider and abettor.  In acting to aid and abet the commission of the fraud and other wrongful conduct complained of herein, each Defendant acted with an awareness of the fraud and other wrongful conduct.  Each Defendant rendered substantial assistance or encouragement to the accomplishment of that fraud and was aware of its overall contribution to the conspiracy, scheme, and common course of wrongful conduct alleged herein.

23.   Each Defendant is joined in this action as a co-conspirator.  Liability arises from the fact that each Defendant entered into an agreement with the other Defendants to commit or to participate in the commission of all or part of the unlawful acts, plans, schemes, transactions and artifices to defraud described above.

### FACTUAL BACKGROUND: Credit Suisse Credit Facility Fraud

I.     **August 2005:  Initial GSM Developer Ginn-LA West End Limited Enters into a Heads of Agreement with the Bahamian Government**

24.   On December 9, 2005, Ginn-LA West End Limited ("GLA Limited"), as the initial developer of GSM, entered into a Heads of Agreement with the Bahamian

government.  The Heads of Agreement provided GLA Limited with governmental cooperation and concessions on transfer taxes, duties and work permits.

25.   The Heads of Agreement stated that GLA Limited intended to master develop 1,957 acres of real property on Grand Bahama Island into a resort community.

26.   The Heads of Agreement stated:

a.   "The parties recognize that timing is critical, as to commencement and timely completion of all phases of the Project . . ."

b.   "The Developer intends to sell residential lots and units within the Project prior to the installation of the Project's infrastructure.  These pre-sales are an important part of the sales and marketing of the Project."

c.   "The beneficial owners of the Development are Edward R. Ginn, III and private investments funds which are controlled by Dean Adler and Ira Lubert."

**III.   June 8, 2006: Defendants CS Borrower and Conduit Lender Close the $675 Million Credit Suisse Credit Facility and Distribute $510 Million**

**A.   The Credit Suisse Syndicated Term Loan Was A New and Unique Loan Product Offered By Credit Suisse**

27.   Around early 2005, Credit Suisse began marketing a new loan product referred to as a syndicated term loan.

28.   One entity that took out a Credit Suisse syndicated term loan was the Yellowstone Mountain Club in Montana ("Yellowstone").  Sometime after it received its Credit Suisse loan, Yellowstone fell into bankruptcy.  In Adversary Proceedings in the Yellowstone bankruptcy (U.S. Bankruptcy Court for the District of Montana, Case No. 09-00014), the Court issued a June 11, 2009 Memorandum of Decision (Doc. No. 292) that set forth the following facts:

a. "In or around December of 2004, Jeffrey Barcy ("Barcy"), a Director in Credit Suisse's Investment Banking Division, made several attempts to send Blixseth [an owner of Yellowstone] and his secretary or assistant emails that contained a two to three-page teaser, providing Blixseth with a brief overview of Credit Suisse and its new loan product referred to as a syndicated term loan, which was described to Blixseth as something akin to a 'home-equity loan.'" (Yellowstone Memorandum of Decision at 22.)

b. "Credit Suisse was specifically trying to 'break new ground with a product by doing real estate loans in the corporate bank loan market.' Through its new syndicated term loans, Credit Suisse was able to offer a loan product the size of which had previously been unavailable to borrowers." (*Id.* at 22-23.)

c. "Barcy testified that Credit Suisse's syndicated loan product had previously been marketed to other master-planned residential and recreational communities such as Tamarack Resort, Promontory, Ginn, Turtle Bay, and Lake Las Vegas. Each of the above entities received a syndicated loan from Credit Suisse's Cayman Islands branch, which allowed the equity holders in said entities to take sizeable distributions from all or part of the Credit Suisse loan proceeds." (*Id.* at 23.)

d. "Similar to the syndicated loans to Tamarack Resort, Promontory, Ginn, Turtle Bay and Lake Las Vegas, the Yellowstone Club Credit Agreement was originally drafted to provide that the proceeds of the loan would be used, in part, for 'distributions' to members of the Borrow for purposes unrelated to the Yellowstone Development." (*Id.* at 24.)

e. "As previously noted, the transfer of loan proceeds out of the Yellowstone Club was a key feature of the product that Credit Suisse used to sell the loan. Yankauer testified that the cornerstone of this loan product was that it allowed preferred resort owners, such as Blixeth, to capitalize on the value of their asset." (*Id.* at 28.)

29.   Before Yellowstone Club obtained its Credit Suisse loan, Cushman & Wakefield was retained to conduct an appraisal of Yellowstone Club property.  Cushman's appraisal was based on future cash flow projections provided by the Yellowstone Club.

## B.    Defendants CS Borrower and Conduit Lender Secretly Obtain the $675 Million CSCF

30.   In late 2005 or early 2006, Credit Suisse contacted either Bobby Ginn or Lubert-Adler to offer the opportunity to take one of Credit Suisse's new Syndicated Term Loans.

31.   Bobby Ginn, Dean Adler, or both, had a series of communications with Credit Suisse concerning whether, and on what terms, Ginn and Lubert-Adler might take a Credit Suisse Syndicated Term Loan.

32.   On March 30, 2006, Defendant GLA West End LLLP executed an "Engagement Letter" with Credit Suisse "in connection with seeking senior secured credit facilities in an aggregate principal amount of up to $[800,000,000]."

33.   Based on his education, background and extensive experience in the real estate investment field, Defendant Dean Adler knew the Syndicated Term Loan offered by Credit Suisse was a new and unique loan product, the size, terms and structure of which had never before been available to borrowers.

34.   Defendants Lubert-Adler, Lubert-Adler Funds III and IV, Dean Adler, ERG, Ginn West End and Ginn-LA West End LLLP caused Defendants CS Borrower and

Conduit Lender to be formed for the sole purpose of serving as the borrowers (collectively "CSCF Borrowers) under a $675 million credit facility with Credit Suisse in the spring of 2006 ("CSCF").

35.    Defendants Lubert-Adler, Lubert-Adler Funds III and IV, Dean Adler, ERG and GLA West End LLLP caused CSCF Borrowers to enter into the $675 million CSCF so that Lubert-Adler and ERG could take a $333 million distribution from the proceeds of the CSCF.

### C. How did Defendants CSCF Borrowers Obtain the $675 Million CSCF?

36.    The CSCF was obtained by cross-collateralizing five Ginn-LA real estate developments, four of which were located in the United States ("CSCF Developments"):

a.  Tesoro, in Port St. Lucie, Florida;

b.  Quail West, in Naples, Florida;

c.  Hammock Beach River Club, in Palm Coast, Florida;

d.  Laurelmor, in North Carolina; and

e.  GSM, on Grand Bahama Island.

37.  A "Property Overview" in the Confidential Information Memorandum projected future lot sales in each of the CSCF Developments as follows:

a.  Ginn would sell 1,858 lots in the GSM development by 2010, with no lots under contract as of May 2006.

b.   Ginn would sell 397 lots in the Tesoro Project in Florida by 2009, with only 11 lots under contract as of May 2006.

c.  Ginn would sell 290 lots in the Quail West Project in Florida by 2008, with only 25 lots under contract as of May 2006.

9

    d.  Ginn would sell 453 lots in the Hammock Beach River Club development in Florida by 2008, with no lots under contract as of May 2006.

    e.  Ginn would sell 1,500 lots in the Laurelmor development in North Carolina by 2010, with no lots under contract as of May 2006.

38.  In fact, the projected future lot sales for the CSCF Developments were speculative and vastly overstated.  For example:

    a.  Tesoro (owned by Defendants ERG 20% and Lubert-Adler 80%) held an extravagant "launch" event in October 2005, during which it obtained sales reservations or contracts for nearly all of the approximately 450 residential lots that were offered and nearly half of the 100 available condominium units. However, following Hurricane Wilma in late October 2005, the vast majority of the Tesoro contracts and sales reservations were cancelled or failed to close.

    b.  Quail West (owned by Defendants ERG 20% and Lubert-Adler 80%) held an extravagant "launch" event in December 2005, during which it obtained sales reservations or contracts for nearly all of the approximately 450 residential lots that were offered.  However, following Hurricane Wilma in late October 2005, the vast majority of the Quail West contracts and sales reservations were also cancelled or failed to close.

39.  In order to obtain the CSCF, Defendants CSCF Borrowers, Lubert-Adler and Dean Adler provided Credit Suisse with Project Projections of cash flow from estimated future lot sales in the CSCF Developments ("CSCF Project Projections").  Those Defendants also provided the CSCF Project Projections to Cushman & Wakefield, which had been designated as the "appraiser" for the CSCF.

40.   Cushman & Wakefield used the CSCF Project Projections to determine the "Total Net Value" ("TNV") of the CSCF Developments.  The Total Net Value of the CSCF Developments was critical to determination of the total amount that could be borrowed under the CSCF.  The higher the TNV assigned to the CSCF Developments, the higher the amount that could be borrowed under the CSCF.

41.   Although the CSCF credit agreements refer to Cushman & Wakefield as the "Appraiser" for the CSCF Developments and refer to the TNV as a "Qualified Appraisal," the TNV valuation was not an appraisal in any sense of the word.

42.   Cushman & Wakefield was initially retained by Credit Suisse to provide a TNV "appraisal" in connection with the Yellowstone Credit Suisse loan.  According to testimony in the Yellowstone Bankruptcy proceeding Credit Suisse engaged Dean Paauw of GSM to provide the TNV "appraisal" of the Yellowstone property.

43.   Paauw testified in the Yellowstone Bankruptcy proceeding that prior to being contacted by Credit Suisse, he had never done or heard of a TNV "appraisal" despite having done approximately 400-500 appraisals in his professional career.

44.   Paauw testified in the Yellowstone Bankruptcy proceeding that he did not know where the definition for TNV had come from and that the TNV "appraisal" did not comply with the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") because it was not an "As Is" or "Market Value" appraisal.  In practice, a TNV valuation is a discounted cash flow analysis that does not apply a discount rate for revenue expected in the future.

45.   The Cushman & Wakefield appraisals defined the "Total Net Value" of each CSCF Development as "the sum of the market value of the bulk lots of the entire planned

community, as if all of the bulk lots were complete . . . and available for sale to merchant builders, as of the date of the appraisal," without deduction or discounting for pertinent risk factors or the time value of money.

46.   The TNV methodology was designed to generate a value that significantly exceeded the actual as-is fair market value of the property interests being valued.  In this way, the TNV methodology allowed the CSCF to have a much lower "loan to value" ratio than would otherwise have been possible using a traditional market valuation of the proposed collateral.

47.   By virtue of the TNV methodology the CSCF did not comply with U.S. banking laws, such as the Financial Institutions Recovery Reform Act of 1989 ("FIRREA"), which provides that, before a regulated financial institution may make or invest in a loan secured by real estate, the loan must be supported by an appraisal reflecting a traditional market valuation of the proposed collateral.

48.   To circumvent this requirement, Credit Suisse coordinated the CSCF through its "Cayman Islands Branch," an off-shore "affiliate" with no physical presence in the Cayman Islands, and syndicated the loan to non-regulated entities, such as hedge funds.

49.   Defendants Lubert-Adler, Lubert-Adler Funds III and IV, Dean Adler and ERG knew the TNV method resulted in "appraisals" for the CSCF Developments that were vastly overstated.  In fact, after the closing of the CSCF, Bobby Ginn reportedly boasted that it was "the best sales job of [his] life."  For example:

   a.   Whereas the St. Lucie County Property Appraiser assessed the value of Tesoro real and tangible property in 2006 at $74,910,626, the TNV of unsold Tesoro lots on April 14, 2006 was $210 million.

b.   Even though Ginn and Lubert-Adler missed the original projections for the Tesoro 2005 launch by a huge margin (projecting 421 lot closing by January 31, 2006 but closing 40 or less), the Project Projections for Tesoro forecasted 74 additional lot and condominium closings during the second half of 2006, with 290 more by the end of 2008.  In actuality, there were fewer than 40 additional lot closings (and no condominium closings) in Tesoro through 2008.

c.   Even though the GSM Land was purchased in August 2005 for $24.5 million, the TNV for GSM was $618 million on June 8, 2006.

50.   The cash flow Project Projections the CSCF Borrowers provided to Cushman & Wakefield in support of the TNV "appraisal" for GSM were speculative, unreasonable and unsupported by historical information.

51.   In addition the Project Projections incorporated the assumption that all marketed amenities for GSM (not just the contractually-required infrastructure) would be developed.  At the time of the GSM Project Projections:

a.   The GSM Land was undeveloped;

b.   The initial developer of GSM had not yet secured approval from HUD to market GSM lots in the United States;

c.   There was no history of GSM lot sales supporting the lot sales prices set forth in the Project Projections;

d.   There were no lot appraisals supporting the lot sales prices set forth in the Project Projections; and

e.   There were purportedly 3,000 GSM lot reservations and 158 powers of attorney for GSM lot purchases, but no contracts for the purchase of GSM lots.

52. In an effort to boost the TNV for GSM, CSCF Borrowers, Lubert-Adler and Dean Adler dramatically increased the projected number of lot sales from the numbers set forth in the December 9, 2005 Heads of Agreement with the Bahamian government. While the original Heads of Agreement contemplated 870 residential lots, the March 31, 2006 Project Projections more than doubled the projections for GSM residential lots to 1,858.

53. Based on the average price per lot used in the Project Projections, the sudden increase in projected lot sales from 870 to 1,858 boosted the projected future Total Lot Sales from $636 million to more than $1.36 billion.

54. Not coincidentally, GSM's initial developer on June 8, 2006 (the date of the CSCF closing) entered into an amendment to the Heads of Agreement to increase the number of residential lots from 870 to 1,890 and to increase the number of condominium units from 4,400 to 4,900.

55. The TNV for all five CSCF Developments was set at approximately $1.5 billion. The TNV for GSM accounted for 41% of this overall amount.

56. The TNV "appraisals" were used to inflate the size of the CSCF to $675 million. Without the use of the overstated TNV "appraisal," Defendants CSCF Borrowers would not have been able to secure the $675 million CSCF.

57. Because it was based on the TNV of CSCF Developments:

a. The size of the $675 million CSCF was not reasonable in comparison to the actual value of the collateral represented by the CSCF Developments.

b. The CSCF utilized speculative projections of future value to create a current debt service obligation in the amount of $675 million.

    c.   The $675 million CSCF carried an excessive risk of failure.

58.   Internal documents and statements by Lubert-Adler, Dean Adler and Bobby Ginn (both before and after the CSCF closing) reveal that those defendants recognized the real estate market crash in late 2005 and the first half of 2006. Those defendants therefore knew the projected future lot sales for the CSCF Developments were overstated and without justification. For example:

    a.   In April 2006, approximately six weeks prior to the CSCF closing, Bobby Ginn, Dean Adler and others received a memorandum from Morris, Manning & Martin, LLP attorney John G. "Sonny" Morris, titled "CSFB Financing / Concerns About Repayment and Presales." According to the bankruptcy trustee for the Tesoro and Quail West developments in an adversary proceeding to void certain aspects of the CSCF as fraudulent transfers, the Sonny Morris memo "foreshadowed a series of problems the proposed borrowers could expect to encounter given the size of the loans they were attempting to procure and the terms of the loans under discussion." (Memo, J. Morris to B. Ginn, D. Adler, etc., 4/19/06, MMMTQW01-024197 – 024201.)

    b.   In May 2006, after having spoken to Dean Adler, Sonny Morris reported, "[Adler] is greatly concerned that a failure to meet projections will result in a default." (Email, J. Morris to B. Masters, etc., 5/26/06, MMMTQW01 - 0224495.)

    c.   In May 2006, Lubert-Adler principal Robert Rosenberg suggested Lubert-Adler might use the market downturn as a selling point in order to obtain approval from the Advisory Boards for Lubert-Adler Funds III and IV for the CSCF: "we could

point out that the pace of sales at Tesoro has recently begun to slow, thereby making it increasingly likely that the Fund III investors will not get to a $36M profit point in the near-term future [absent the CSCF]." (Email, R. Rosenberg to D. Adler, etc., 5/3/06, forwarded to J. Morris, etc., 5/4/06 - 5/5/06, MMMTQW01_024124 -024125.)

d.   According to the Tesoro/Quail West bankruptcy trustee, Credit Suisse was so anxious about "market conditions" in June 2006 that it strenuously advised against "any material change in structure [that] may cause us to have to go back out to investors and reconfirm their orders," or would otherwise result in "any kind of a delay." (Email, M. Speller to B. Wobeck, etc., 6/6/06, MMMTQW01-024460 – 024467.)

e.   In April 2007, Ginn-LA C.F.O. John P. Klumph expressed "concerns" that "the Lenders could second guess the completeness of the [pre-loan] disclosure" in light of a failure to account for dozens of Tesoro and Quail West contract cancellations. He advised that "[i]n the detailed reports to be provided going forward [he was] planning to show total contracts and cancellations for 2006 only as of year end so as not to draw unwarranted attention to the issue." (Email, B. Wobeck to J. Morris, etc., 4/30/07, MMMTQW01_006138 – 006140.)

f.   In June 2007, Lubert-Adler principal and Head of Asset Management, Stuart A. Marguilies, sent and email stating – with respect to "Future Sales" – "In the current climate and foreseeable future, sales forecast[s] are unreliable even at reduced levels. Accordingly, sales proceeds are not a reliable funding source [for

loan repayment]. (Email, S. Marguilies to R. Rosenberg, J. Klumph, J. Morris, 6/6/07, LA051640 – 051642, MMMTQW01_021877.)

g. In a July 23, 2008 conference call with certain Ginn owners, Bobby Ginn admitted that the real estate market crash prior to the CSCF was unprecedented: "The market crash[] from the end of 2005 . . . to July of 2006 was as big a falloff in housing as I have ever seen in 40 years. . . . The market was going bad from the end of 2005 through the entire year of 2006, but the first six months of 2006 was brutal. I mean it's like somebody threw a rock off the ledge, it was sharp and [a] long downhill fall...."

h. According to the Tesoro/Quail West bankruptcy trustee, "Ginn and Lubert-Adler records reveal that, during the third quarter of 2006, total net revenues at Tesoro and Quail West were approximately 3% of previously forecasted amounts, due to 'the lack of real estate sales.'"

i. According to the Tesoro/Quail West bankruptcy trustee, "By mid-2007, Ginn and Lubert-Adler were formally reporting to the Lenders that '[t]he slowdown in the residential real estate markets ha[d] adversely impacted the Borrower's project sales and, as a result, its ability to comply with the terms of the existing credit agreements.' In addition, they acknowledged that, '[d]ue to the significant shortfall in expected sales to date, the Borrower must source outside capital in order to fund the key infrastructure and amenities costs.' (E.g., Ginn Lender Presentation, 4/23/07, LA050798 – 050827; 6/21/07 LA053007 – 053042.)"

j. According to the Tesoro/Quail West bankruptcy trustee, "In early 2008, as it became harder for Ginn and Lubert-Adler to deny that they had, in fact,

17

'doomed' the Projects 'to failure,' Ginn-LA representatives and attorneys met several times to discuss potential bankruptcy filings for the Debtors [Tesoro and Quail West] and Other Project Entities, and various issues relating thereto, including:

- '[The] need [for] a bankruptcy plan';

- 'Conflicts issue[s]';

- 'Substantive consolidation';

- 'Separation of entities';

- 'Debt goes across all projects';

- 'Need to figure out how to strip off debt per property';

- 'How to separate each project's liabilities';

- 'Does each entity have to stand for repayment as a whole';

- 'Are there grounds for piercing the corporate veil'; and

- 'Return of equity at original closing → fraudulent conveyance.'

(E.g., Handwritten Notes / Emails, 3/28/08 – 4/30-08, MMMTQW01_031126, 031120 – 031125, 031295, 031103.)"

k.   According to the Tesoro/Quail West bankruptcy trustee, with respect to the distribution to Lubert-Adler and ERG, "the concern among those involved was that the '[d]istribution to Equity from [the] original closing could be challenged as [a] fraudulent conveyance,' because 'the debtors … did not get reasonably equivalent value [therefor],' and '[the] conveyance [was one] which rendered the debtors insolvent or unreasonably capitalized.' (Handwritten Notes of Mtg., MMMTQW01_016232.)"

59.   Defendants GLA West End LLLP, Lubert-Adler, Dean Adler and ERG knew the facts set forth in Paragraphs 30-58, above, but fraudulently concealed those facts from prospective purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group.

**D.     How Were CSCF Borrowers Planning to Repay the $675 Million CSCF?**

60.   To obtain the CSCF, it was necessary for Lubert-Adler, Dean Adler, ERG and CSCF Borrowers to allocate the future cash flow from lot sales in GSM (and the other CSCF Developments) to meet repayment obligations under the CSCF, instead of allocating cash flow from lot sales in the CSCF Developments to the benefit of each development as an independently capitalized development subject to its own market conditions.

61.   The ability of CSCF Borrowers to service the debt under the $675 million CSCF was dependent on cash flow from future "projected" lot sales in the CSCF Developments:

a.   Tesoro:  14%

b.   Quail West:  10%

c.   Hammock Beach:  6%

d.   Laurelmor:  29%

e.   GSM Subdivision:  41%

62.   The Projections called for 59% of the cash flow for CSCF repayment to come from future lot sales in four CSCF Developments in the United States.

63.   The CSCF required that repayment using 100% of excess cash flow until one-half of the first-lien balance was repaid.  Thereafter, 50% of excess cash flow was required to be applied to outstanding balances.  Thus, 100% of excess cash flow from the

sale of every lot in the CSCF Developments was funneled to Credit Suisse in service of the CSCF debt obligation.

64. Under the terms of the CSCF, if the U.S. CSCF Developments did not meet lot sales projections, Defendant GLA West End LLLP was required to loan the U.S. CSCF Developers the funds necessary to meet their CSCF repayment obligations ("GSM Shortfall Obligations").

65. Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew the facts set forth in Paragraphs 60-64, above, but fraudulently concealed those facts from prospective purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group.

**E.    How Was the $675 Million CSCF Secured?**

66. The $675 million CSCF was collateralized across all five CSCF Developments: substantially all assets of CSCF Borrowers and each development, including all land and improvements, were pledged by Lubert-Adler, Lubert-Adler Funds III and IV, Ginn-LA CS Holding, ERG and Ginn-LA West End LLLP to secure the CSCF.

67. Lubert-Adler, Lubert-Adler Funds III and IV, Ginn-LA CS Holding, ERG and Ginn-LA West End LLLP also pledged as collateral under the CSCF their ownership interests in the developer companies for each CSCF Development, including all company assets and rights of control.

68. GSM, along with Defendants GLA West End LLLP and Ginn West End GP were responsible for the entire amount of the $675 million CSCF.

69. First, the CSCF was secured by a $276 million mortgage on all 1,957 acres of the GSM Land. More specifically, the CSCF was secured by a collateral assignment of

an intra-company note and mortgage on the GSM Land given by initial GSM developer GLA Limited to Defendant Conduit Lender.

70.   Second, Lubert-Adler and ERG pledged their ownership interests in Defendants GLA West End LLLP and Ginn West End, which interests included all company assets, rights over the control of future development of GSM, "developer" status under the "Heads of Agreement" with the Bahamian government, control over the GSM Home Owners Association, control over the GSM CC&Rs (which run with the title to Plaintiffs' lots and govern Plaintiffs' rights and obligations in connection with the ownership of their lots), control over operation of GSM Club Operation, and control over the GSM Architectural Control Board.

71.   Defendant GLA West End LLLP (the ultimate parent company for the initial developer of GSM: GLA Limited), in turn, guaranteed the obligations under the $675 million CSCF by a pledge of 65% of its interests in the immediate parent company for the initial developer of GSM: GLA Limited) and 100% of its interests as the sole owner of Defendant Conduit Lender, including its management and control rights in both entities.

72.   Although Defendants Lubert-Adler, Lubert-Adler Fund IV and ERG guaranteed the pledge of their interests in Defendant GLA West End LLLP and Ginn West End, those guarantees were non-recourse as to Lubert-Adler, Lubert-Adler Fund IV and ERG. Thus, even though the GSM development was liable for the entire $675 million CSCF, Lubert-Adler, Lubert-Adler Fund IV and ERG made sure they had no liability for the $675 million CSCF debt.

73.   Even though ownership and control of GSM were pledged as collateral for the CSCF, the CSCF was not intended to – and did not – benefit GSM.  To the contrary, the

CSCF prevented future GSM development and exposed GSM purchasers, including Plaintiffs, to risk of a CSCF default and foreclosure.

74.  From the June 8, 2006 CSCF closing, GSM was bound to the success or failure of the U.S. CSCF Developments.  If the U.S. CSCF Developments failed to generate sufficient cash flow to meet CSCF repayment obligations, the entire risk of default fell on GSM.

75.  In light of the terms of the CSCF, GSM lot owners, including Plaintiffs, were unknowingly investing in all five of the CSCF Developments.

76.  Defendants GLA West End LLLP, Lubert-Adler, Dean Adler and ERG knew the facts set forth in Paragraphs 66-75, above, but fraudulently concealed those facts from prospective purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group.

**F.      What Happened to the $675 Million Borrowed Under the CSCF?**

77.  The terms of the CSCF provided that less than a quarter of the CSCF proceeds would be used for working capital or development purposes:  only the $165 million synthetic revolving loan was to be maintained in a deposit account "to fund general company and working capital needs" and "to finance a portion of the development, construction and other costs associated with each Project."

78.  On the June 8, 2006 CSCF closing date, CSCF Borrowers sent "irrevocable" notices to Credit Suisse requesting disbursement of $510 million.  From that amount, the CSCF required distributions of $333,125,000 to Lubert-Adler Funds III and IV and ERG ("CSCF Distribution").

79.   CSCF loan proceeds were also applied "to repay "Existing Indebtedness" of the CSCF Developments.  Of roughly $158 million used to repay Existing Indebtedness, only about $12 million was applied to Existing Indebtedness for GSM.

80.   Prior to the CSCF, the only Existing Indebtedness of GSM was a mortgage on GSM Land for $12 million.  Although that mortgage note was paid off with CSCF proceeds, it was replaced by a mortgage note of more than $276 million on GSM Land and liability for the entire $675 million CSCF.

81.   Of $510 million taken by CSCF Borrowers on the CSCF closing date, 64% went to "distributions" to ERG and Lubert-Adler; 29% went to existing indebtedness for other Ginn developments, 5% went to transaction costs, and only 2% went to existing indebtedness for GSM.

82.   Defendants GLA West End LLLP, Lubert-Adler, Dean Adler and ERG knew the facts set forth in Paragraphs 77-81, above, but fraudulently concealed those facts from prospective purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group.

**G.     What Happened to $333 Million Distributed to Lubert-Adler and ERG?**

83.   Defendants Lubert-Adler and ERG have never revealed what became of the $333 million distribution they took from the $675 million CSCF.

84.   It was common knowledge among GSM sales persons in Summer 2006 that Bobby Ginn took a large loan and used the money to purchase a NASCAR racing team.

85.   It was initially announced in 2006 that Ginn Clubs & Resorts agreed to become the primary sponsor for MB2 Motorsports for a limited number of races in 2006.  In July 2006, Bobby Ginn became the majority owner (80%) of MB2 Motorsports, which raced as the NASCAR Nextel Cup series team Ginn Racing.

86.   Bobby Ginn poured millions into the NASCAR team within a short period of time.  He purchased a $2.5 million "7-post shaker," a piece of equipment for chassis building that only the wealthiest multi-car NASCAR teams actually owned instead of leasing.  He expanded the two-car team to three, and he purchased at least two private jets for the team. Bobby Ginn spent tens of millions to upgrade the race team.

87.   Ultimately, Bobby Ginn's foray into NASCAR has been called the quickest and most dramatic rise and fall of a race team in recent NASCAR history.  One commentator in mid-2007 described Bobby Ginn's approach to NASCAR in terms that could apply just as easily to his role in the GSM debacle:

> Since owner Bobby Ginn purchased the two-team organization formerly known as MB2 Motorsports from its previous majority owner Nelson Bowers barely a year ago, what the NSACAR community has witnessed is an illusion, a highly calculated gamble, based on maintaining an appearance of stability to gain acceptance within the sport in hopes of securing significant outside financing, money that was desperately needed to continue the charade.  And it was a fairly well orchestrated deception …one that almost worked.  The plan's down fall was simply that no corporate sponsor was ever found that would take the bait that Bobby Ginn set out, and the ruse has now begun to unravel.

## IV.   The $675 Million CSCF Prevented Development of Amenities Planned and Marketed for GSM

88.   In a June 2005 letter to the Bahamian government, a Bahamian attorney for GSM, Terence Gape, described Ginn Development Company's strategy for marketing and developing residential resort communities:

> Ginn have been successful because before it develops a Project, it successfully markets and pre-sells at least 1/3 of the lot product to be built:  this guarantees the performance of the Company to complete the Project so that buyers can have complete confidence that what is in the "blurb" will be built.

89.   Mr. Gape's June 2005 letter stated that pre-sales were essential to Ginn's successful development of GSM:

Ginn can only be successful if it can market the Project as it does in the United States and that is by pre-sales which in its first Launch guarantee (in addition to the Hartford Bond) the full performance by the Company. This process of pre-sales in the past 10 years does attract investors who purchase lots and/or condominiums before construction and fully pay for them happy in the knowledge that within 1 year or 2 or 3 they can sell onward for a profit.

90. In reality, the CSCF payment terms (requiring that 100% of cash flow from GSM lot sales to be used to service the CSCF debt) prevented the initial developer of GSM from generating sufficient cash flow to support development of amenities planned and marketed for GSM.

91. The terms of the CSCF prevented GSM from incurring any additional debt. And because the CSCF leveraged GSM to the hilt, there was no remaining equity in GSM to support the development of amenities planned and marketed for GSM.

92. With no funds allocated for GSM development, 100% of cash flow from GSM lot sales obligated to debt service and a prohibition on additional debt, there was simply no money available for the development of GSM. The terms of the CSCF made development impossible.

93. In light of the CSCF, GSM lot owners, including Plaintiffs, were unknowingly investing in a development that had been looted by Lubert-Adler and ERG so those defendants could take a $333 million distribution.

94. If Lubert-Adler, Dean Adler and ERG had not facilitated the CSCF or if those defendants had not included GSM as part of the CSCF, GSM would have remained an independently capitalized development, responsible for its own debt and entitled to use its cash flow.

95. If Lubert-Adler, Dean Adler and ERG had not facilitated the CSCF or if those defendants had not included GSM as part of the CSCF, GSM lot sales from 2006 through

2008 (prior to the date when sales were prohibited by HUD) would have been sufficient to service the $12 million mortgage on GSM Land, to fund contractually-required infrastructure, and to begin development of the amenities that were planned and marketed for GSM.

96.   In a February 5, 2004 letter, Bahamian attorney Terence Gape assured the Bahamian Minister of Financial Services and Investments that GSM was more secure because it would be owned 100% by Ginn, rather than by multiple developer parties: "This is all very good news and will allow Ginn to have one hundred percent ownership and control of the project with no potential internal conflicts for the future."

97.   In light of the CSCF, GSM lot owners, including Plaintiffs, bore the undisclosed risk of a CSCF default and a Credit Suisse foreclosure on GSM ownership and control over future development, such that Ginn would no longer have "one hundred percent ownership and control of the project with no potential internal conflicts for the future."

**V.    Lubert-Adler Informed Advisory Boards for Lubert-Adler Funds III and IV About the Objectives and Risks of the $675 Million CSCF**

98.   An April 24, 2006 draft memo of Dean Adler to Advisory Boards for Defendants LA Funds III and IV less than two months before the June 8, 2006 CSCF closing lists the goals of the CSCF including: (1) "immediate mitigation of 100% of the capital risk" and "removal of all guarantee exposure" for Defendants LA and Bobby Ginn by "paying off all existing recourse debt" and replacing it with debt that was recourse to the CSCF developments; and (2) "an immediate dividend of $333,125,000" that allows "the harvesting of profits with no risk of capital loss" and would "provide an earlier than anticipated profit distribution."

99.   The memo also details risks inherent in the CSCF, which requires that "the properties will all be cross-collateralized," such that "any poorly performing properties would be supported by the other properties":

> [T]he principal risk of any cross-collateralized financing is that Project A (e.g., Tesoro), though highly successful on its own, could nevertheless be lost to foreclosure in the event that Project B (e.g., Laurelmor) or Project C (e.g., Grand Bahamas-West End) do not perform well, thereby causing the Credit Suisse loan to go into default.
>
> …
>
> If the Projects continue to be developed separately, the owner of each Project will be free to evaluate whether to invest more capital in that particular Project or let it go – solely on the merits of that particular Project.  Once the Projects have become part of a cross-collateralized mortgage pool, the common owner of Project A and Project B will, to some degree, be forced to support Project A (performing poorly) in order to protect its equity in Project B (performing well).
>
> …
>
> [T]he percentage of loan proceeds which is allocated to each Project will not be based upon a "fairness" opinion or a current fair market appraisal of each Project.  Accordingly, the investors in each Project must make a determination as to whether the perceived benefits to that Project from the proposed financing will, on balance, be proportionate to the potential risks assumed by that Project.

100.      Recognizing the sharp downturn in the real estate markets in late 2005 and the first two quarters of 2006, Lubert-Adler and Dean Adler grew concerned that Lubert-Adler's investment funds would not see returns from the Ginn-LA developments. Unwilling to wait for legitimate returns from lot sales in those developments, Lubert-Adler and Dean Adler pooled five independent Ginn-LA developments, "harvested" early profits without any risk, shifted all recourse and risk for debt obligations to the CSCF developments (including GSM) and left the formerly independent developments to stand or fall as one.

### V.   Almost Immediately After Closing on the $675 Million CSCF, Bobby Ginn Was Concerned About Defaulting on the Loan

101.     Faced with the prospect of meeting the staggering GSM lot sales projections provided to Cushman & Wakefield in order to obtain the $675 million CSCF ("Projected GSM Lot Sales"), only days after closing on the $675 million CSCF and before Plaintiffs entered into their GSM lot purchase contracts, Bobby Ginn revealed his concern that Ginn would not meet the Projected GSM Lot Sales.

102.     Shortly after the June 8, 2006 CSCF closing, there was disagreement within the Ginn organization about how to close GSM lot sales at a sufficient rate to meet the Projected GSM Lot Sales.  A June 16, 2006 email from John Gantt, the head of sales for Ginn Development, reported:

> I just had the pleasure of speaking to Bobby.  He asked what we are doing sales wise at Versailles at the moment.  I told him that we are getting ready to bring some of the back lots on the market, exactly what I thought we all talked about in Greenville.  He told me in no uncertain terms that he had instructed us to sell 110 more Ocean lots and he said he wanted it done in the next 60 days. He also said not to sell back lots until those 110 were sold.  He jumped my ass over and over.  Please let me know your thoughts ASAP.

103.     In a June 19, 2006 email, Myles Newell wrote to John Gantt and others, disagreeing with the suggestion from "Bobby" that the sales team only sell Ocean lots instead of other GSM lots.  He indicated that the sales team would attempt to sell Ocean lots, but that they should also attempt to close sales on other GSM lots with reservation holders who would be more likely to buy the other lots (which were being offered at lower prices).  He concludes:

> In summation – We have lots available for sale, we have people that want to buy them, we need to generate a large amount of revenue in a very short period of time – I do not know why we would not stay on this plan.  It will not take away from trying to sell as many oceanfronts as possible.  However, if we do not release any other inventory and put all our eggs in the oceanfront lots we have not fall back plan and our chance for failure rises drastically in my

opinion.  John, please go over this with Bobby or set up a time for all of us to go over it with him or simply forward him my email.  I will do whatever I can to keep us on this path.

## VI.    Fraudulent Concealment of the Existence and Terms of the $675 CSCF ("Initial CSCF Fraud")

104.    In order to make sufficient lot sales in GSM (as well as the other CSCF Developments) to meet the repayment obligations under the $675 million CSCF, it was essential for Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG to conceal the existence and terms of the CSCF from prospective purchasers in GSM (as well as from prospective purchasers in the other CSCF Developments).

105.    Although Lubert-Adler and Dean Adler informed the Advisory Boards for Lubert-Adler Funds III and IV about the objectives and risks of the $675 million CSCF, Lubert-Adler and Dean Adler knew it was essential to conceal the existence and terms of the CSCF from prospective GSM lot purchasers.

106.    Because the CSCF was a new loan product with extraordinarily unique terms, prospective purchasers in GSM, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, had no reason to expect that GSM was part of a $675 million credit facility that was cross-collateralized over five different Ginn-LA developments, out of which Defendants Lubert-Adler, Dean Adler and ERG had taken a $333 million distribution.

107.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, the massive amount of the $675 million CSCF.

108.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taglia Group,

Verhees and Cappuccino Group, were informed about the massive amount of the $675 million CSCF, those prospective purchasers would have inquired further into the terms of the CSCF.

109.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, the existence and amount of the CSCF Distribution.

110.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, were informed about the existence and amount of the CSCF Distribution, those prospective purchasers would not have purchased GSM lots.

111.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, the pledge of all ownership interests in Defendant Ginn-LA West End LLLP to Credit Suisse as collateral for the CSCF ("Pledge of GSM Interests").

112.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, were informed about the Pledge of GSM Interests, those prospective purchasers would not have purchased GSM lots.

113.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs

Taglia Group, Verhees and Cappuccino Group, the pledge of their ownership interests in the GSM Land to Credit Suisse as collateral for the CSCF ("Pledge of GSM Land").

114.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, the fact that that the CSCF was partially secured by a $277 million mortgage on the GSM Land.

115.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, were informed that the CSCF was partially secured by a $277 million mortgage on the GSM Land, those prospective purchasers would not have purchased GSM lots.

116.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, the fact that CSCF loan proceeds were applied "to repay the "Existing Indebtedness" of the five CSCF Developments.

117.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, were informed that the terms of the CSCF provided funding for five Ginn developments, not just GSM, those prospective purchasers would not have purchased GSM lots.

118.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, the fact that only 2% of the Initial CSCF

Disbursement went to existing indebtedness for GSM, while 64% went to the CSCF Distribution; 29% went to existing indebtedness for four Ginn developments other than GSM, and 5% went to transaction costs for the CSCF.

119.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, were informed about how much of the CSCF went to GSM, those prospective purchasers would not have purchased GSM lots.

120.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, the facts that the $675 million CSCF was to be repaid from cash flow generated by the future "projected" lot sales in all five CSCF Developments and that 58% of the cash flow for CSCF repayment to come from future lot sales in the U.S. CSCF Developments.

121.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, were informed that that the $675 million CSCF was to be repaid from cash flow generated by the future "projected" lot sales in all five CSCF Developments or that 58% of the cash flow for CSCF repayment to come from future lot sales in the U.S. CSCF Developments, those prospective purchasers would not have purchased GSM lots.

122.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, the GSM Shortfall Obligations.

123.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, were informed about the GSM Shortfall Obligations, those prospective purchasers would not have purchased GSM lots.

124.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, the GSM Repayment Obligations.

125.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, were informed about the GSM Repayment Obligations, those prospective purchasers would not have purchased GSM lots.

126.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed the GSM Repayment Obligations from prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group.

127.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, were informed that the terms of the CSCF precluded any future debt on GSM assets or by Defendant Ginn-LA West End LLLP, those prospective purchasers would not have purchased GSM lots.

128.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed the fact that that the terms of the CSCF precluded any future debt on GSM assets or by Defendant Ginn-LA West End LLLP from prospective GSM purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group.

VII.  **Fraudulent Concealment Concerning the 2007 Default and CSCF Restructure ("2007 CSCF Default Fraud")**

129.    In the first quarter of 2007, three months after closing on the first GSM lot sales, Defendants CSCF Borrowers defaulted on the CSCF ("2007 Initial CSCF Default").

130.    The 2007 Initial CSCF Default was not due to the underperformance of lot sales in GSM.  The initial GSM developer (Ginn-LA West End Limited) closed at least 194 lot sales through 2007.

131.    The 2007 Initial CSCF Default was instead due to the underperformance of sales in other CSCF developments and particularly the Florida CSCF developments, which created a cash flow deficit that impaired the ability of the CSCF Borrowers to meet the payment obligations under the CSCF.

132.    As a result of the CSCF Initial Default, in the first quarter of 2007, Defendants CSCF Borrowers, Lubert-Adler, Lubert-Adler Fund IV and Lubert-Adler Fund V and Ginn-LA OBB entered into agreements to restructure the CSCF in order to avoid foreclosure ("2007 CSCF Restructure").

133.    The GSM resort core land included the land on which the proposed GSM casino, condominium tower and hotel, shops and restaurants, mega-yacht marina and golf club were to be constructed (collectively "GSM Resort Core").

134.    In connection with the 2007 CSCF Restructure, the initial GSM developer (Ginn-LA West End Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

135.    In connection with the 2007 CSCF Restructure, the initial developer of GSM (Ginn-LA West End Limited) on July 20, 2007 entered into an Assignment Regarding Heads of Agreement with Defendant Ginn-LA OBB that made an exclusive

assignment to Defendant Ginn-LA OBB, *inter alia*, of all the rights set forth in the Head of Agreement relating to the gaming license for the GSM casino.

136.     In connection with the 2007 CSCF Restructure, the Board of Directors for the initial developer of GSM (Ginn-LA West End Limited) executed a Written Consent ("GLA BOD Written Consent") on July 20, 2007.  Dean Adler signed the GLA BOD Written Consent.

137.     The GLA BOD Written Consent acknowledged that GSM had been encumbered with a mortgage as security for the $675 million CSCF and that Defendants CSCF Borrowers had defaulted under the CSCF.

138.     The GLA BOD Written Consent acknowledged that as part of the 2007 CSCF Restructure, GSM initial developer Ginn-LA West End Limited was selling the GSM Resort Core to Defendant Ginn-LA OBB.

139.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG concealed the existence of the 2007 Initial CSCF Default and the terms of the 2007 CSCF Restructure from prospective purchasers in GSM and GSM lot owners, including Plaintiffs.

140.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and Ginn-LA OBB knew that if prospective GSM purchasers and GSM lot owners, including Plaintiffs, were informed about the 2007 Initial CSCF Default or that the GSM Resort Core had been sold to Defendant Ginn-LA OBB, several results would occur, including the following:

    a.   At least some GSM lot owners, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, would have inquired further into the existence and terms of

the $675 million CSCF, the 2007 Initial CSCF Default and the 2007 CSCF Restructure.

b. At least some GSM lot owners, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, would have discontinued making payments under GSM lot loans with Ginn Financial /Bahamas Sales.

c. At least some GSM lot owners, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, would have considered taking legal action as a result of the Initial CSCF Fraud.

d. Prospective purchasers, including Plaintiffs Taglia Group, Verhees and Cappuccino Group, would not have closed on their GSM lot purchases.

## VIII. Fraudulent Concealment Concerning the 2008 Default and CSCF Restructure ("2008 CSCF Default Fraud")

141.    Notwithstanding the serious issues with cash flow and debt obligations, Bobby Ginn conducted a press tour in January 2008 to spread the word that GSM development was moving forward, that construction on 375 units was expected to begin in early summer of 2008, that construction on residential lots was expected to begin later in 2009, and that GSM would be "fully operational in our core facilities with our amenities" in five years.

142.    On June 30, 2008, Defendants CSCF Borrowers again defaulted on the CSCF by, among other things, failing to make required payments of interest, principal, and other amounts due under the Loans ("Final CSCF Default").

143.    The Final CSCF Default was not due to the underperformance of sales in GSM. The initial GSM developer (Ginn-LA West End Limited) had its best sales month